LOUIS BABB v. THE STATE.

1. MALICE — CHARGE OF THE COURT. — In all trials for murder or assaults to commit murder, it is incumbent on the court below, in its charge to the jury, to explain the term *malice*.
2. CHARGE OF THE COURT — MANSLAUGHTER. — It is error to charge that the jury may find the defendant guilty of manslaughter without also instructing them as to what state of facts would constitute that offense.

APPEAL from the District Court of Washington. Tried below before the Hon. I. B. McFARLAND.

This appeal is from a conviction for murder in the second degree, and a term of fifty years in the penitentiary. Milton McGowan, the deceased, was killed in August, 1879. A former appeal in this case is reported in 8 Texas Ct. App. 173.

Sarah McGowan, mother of the deceased, testified for the State that on the Wednesday night before the killing the defendant came to her house, and she told him to go away, and not to return to her house again. He returned on the next night, and he and the deceased then had some words. The defendant went off and returned with a gun and threatened to kill the deceased. The witness again ordered him to leave and not to return. On Friday, the next evening, he returned with his gun,

and was met by the witness at the fence. While the two were there talking the deceased passed them, going towards the house. As he passed, the defendant addressed him and said: "I have come to settle that difficulty." The deceased replied: "Wait until I go into the house and return." The deceased went into the house, remained a few moments, came out with a pistol in his hand, and started towards the defendant. The defendant shot the deceased when the latter was only five or six feet from the door. When shot the deceased held the pistol in his right hand, hanging down by his right side.

The defendant and deceased were raised in the same neighborhood, had always been good friends, and the witness had never known them to have a difficulty until the night before the killing. The defendant had spent the night with the deceased several times. After the deceased fell he fired his pistol. He did not fire until after he was shot and was on the ground.

Lucy Lewis, an eye-witness, testifying for the State, corroborated Mrs. McGowan in every particular, and stated, in addition, that she did not hear Rhoda Wetherall tell the defendant to "look out," that "Milton McGowan was coming out to shoot him."

Rhoda Wetherall testified for the State that she was in the house when the deceased came in and got his pistol, and when he was killed. She did not tell the defendant to look out, that the deceased was going to kill him, nor did she even know that the defendant was in the vicinity until after the shooting. Sarah McGowan went out of the house before the shooting occurred. The defendant left, and the witness next saw him one week later in the custody of an officer.

Bob McGowan, a brother of the deceased, testified that he was about fourteen years old at the time of the trial. After sunrise on the morning of the day on which the deceased was shot, the witness met the defendant on the

highway between his mother's residence and that of Betsy Green. Defendant came out of the bushes with a gun, and told the witness that he would give witness two bits to tell him where he could find the deceased,— that he wanted to kill him.

Cross-examined, the witness stated that the defendant had never been at the McGowan house, and had never stayed there over night. Witness made no answer to the defendant's proposition to tell him where deceased was, and had never told the deceased about it, but told his mother when he got home. The deceased was about the neighborhood all the time, was not hiding out, and could easily have been found.

Louis Lander testified, for the defense, that the defendant had been working for him for three or four months before the shooting of the deceased. The defendant had been shot himself some time before the killing of the deceased, and since that time had carried his gun with him wherever he went. The witness lived a mile or a mile and a half distant from McGowan's. The defendant was at his house at sun up or some time after on the morning of the day on which the shooting occurred.

Dave Spriggins testified, for the defense, that he lived about one-half of a mile from the scene of the shooting. He heard two shots in the direction of the McGowan house that night; they were fired almost at the same time. The report of the first shot was not so loud as that of the second.

George Bullard, the defendant's half brother, testified that he had often seen the defendant at McGowan's previous to the shooting.

John Lauderdale testified that he lived between a half mile and a mile from the McGowan place. On the night of the killing he heard two reports in rapid succession; the smaller of which appeared to have been fired first. The last shot made the loudest report, and sounded as

though the gun made a long fire.   The witness had seen the defendant at McGowan's several times before the shooting.

In rebuttal the State introduced Rhoda Wetherall, who stated that she was in the house at the time of the killing.   She heard no pistol shot at all.   The gun seemed to make a long fire, as if the cap popped, and then the report followed.

*W. W. Searcy*, for the appellant.

*J. H. McLeary*, Attorney General, for the State: There was no necessity of drawing a distinction between express malice and implied malice, as the defendant had already been acquitted of murder in the first degree, and there was no malice to be considered except implied malice.   In fact, there is no difference between malice express and implied, except in the mode of proof. Malice is the same passion of the mind, or feeling of the heart, whether it is express or implied, and the different ways in which it may be shown by evidence makes the distinction drawn by the Code.

But as to the first clause of this assignment, the attention of the court is called to the fact that no charge defining malice was asked by the defendant, and though the court is bound to give all the law appertaining to the case, whether asked or not, it is not believed that a charge expressly defining malice was necessary in this case.   The law applicable to the case was given clearly and fully. The jury was instructed that the utmost guilt which they could find against the prisoner was murder in the second degree.   Murder was defined, and the difference between the two degrees sufficiently drawn for the purposes of this case.   The circumstances which would reduce the offense to manslaughter were set out, and the jury was also instructed as to the intent with which the prisoner went to the home of deceased, and the prisoner given full benefit of every, even the slightest, favorable circum-

stance indicated by the evidence. The definition of malice was not necessary to an intelligent verdict in this case. *Williams* v. *State*, 10 Texas Ct. App. 538, 539.

The court in the charge gives the statutory definition of manslaughter, and instructs the jury that they may, if the evidence warrants, acquit of murder, and find defendant guilty of manslaughter, and gives them the penalty for manslaughter. No further charge on the subject of manslaughter was asked, and the evidence does not show a single circumstance to justify such a charge, had it been requested. The prisoner went to the home of deceased with the avowed purpose of killing him, and did kill him in cold blood. This was clearly murder. *Maria* v. *State*, 28 Texas, 698; *Williams* v. *State*, 10 Texas Ct. App. 538.

WILLSON, J.   The defendant was convicted of murder in the second degree and his punishment assessed at confinement in the penitentiary for fifty years. The court below in its charge to the jury entirely omitted to instruct the jury as to the meaning of malice.

There can be no murder without malice, and in all trials for murder, and assaults with intent to commit murder, the court in its charge must define and explain the term malice. This rule has been established by the repeated decisions of the Supreme Court of this State, and by this court, and has in no single instance been departed from or disregarded. (*Villareal* v. *State*, 26 Texas, 107; *Anderson* v. *State*, 1 Texas Ct. App. 730; *Smith* v. *State*, Id. 516; *Williams* v. *State*, 3 Texas Ct. App. 317; *Hodges* v. *State*, Id. 472; *Jones* v. *State*, 5 Texas Ct. App. 397.)

The court also erred in instructing the jury that they might find the defendant guilty of manslaughter, without also instructing them as to what state of facts would constitute that offense.

*Reversed and remanded.*